**Rita WARREN, Plaintiff,**

v.

**FAIRFAX COUNTY, Defendant.**

**No. CIV. A. 97–119–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 17, 1997.

Victor M. Glasberg, Jeanne Goldberg, Victor M. Glasberg & Assoc., Cooperating Counsel for the American Civil Liberties Union Foundation of VA, Alexandria, VA, Mary

Bauer, American Civil Liberties Union Foundation of VA, Richmond, VA, for Plaintiff.

David P. Bobzien, County Atty., J. Patrick Taves, Senior Asst. Cnty. Atty., Karen L. Gibbons, Asst. Cnty. Atty., Fairfax, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This case presents the question whether a county may constitutionally limit the use of an area designated as a public forum to county residents and employees and certain nonprofit entities.

### I

Plaintiff Rita Warren, a devout Christian, seeks to spread the message of "love, hope, and peace" by mounting religious displays at the Fairfax County Government Center Complex ("the Complex") at certain times of the year. Specifically, she wants to erect a crèche and a cross outside the Complex during the Christmas and Easter seasons. Fairfax County has refused to allow her to utilize space at the Complex, citing local regulations that limit use of the Complex grounds to certain County-affiliated entities.

The Complex comprises three buildings, in which over 2,500 County employees work, and the adjacent grounds. The largest of the buildings is the Government Center Building, which is the site of County government offices. A horseshoe-shaped driveway runs in front of the Government Center Building. This driveway encloses a landscaped median area called the "Center Island." It is within this Island that plaintiff seeks to erect her displays.

The County's Procedural Memorandum # 08–05 ("the Memorandum") governs the use of all County common areas at the Complex, including the Center Island. It declares that the County's policy is to encourage public use of all common areas at the Complex. To that end, the Memorandum establishes procedures for obtaining a use permit. Significantly, the Memorandum specifically limits use of the Center Island to County residents, County employees, and County nonprofit groups.[1] In addition to this use restriction, the Memorandum requires that any physical display be attended by an adult at all times.

Plaintiff cannot qualify for a permit because she is neither a County resident nor a County employee.[2] Moreover, she notes that she cannot meet the County requirement that she attend her display at the Complex because she erects similar holiday-time displays at the United States Capitol, which she must also attend.[3] Accordingly, the County, pursuant to the terms of the Memorandum, has declined to issue plaintiff a permit to set up her crèche and cross in the Center Island.

Plaintiff instituted this suit in response to the County's actions. Her complaint contains four counts. The first, based on the Religious Freedom and Restoration Act ("RFRA"), must be dismissed given the Supreme Court's holding last Term that RFRA

---

1. These are organizations that are either located in Fairfax County or, if located elsewhere, serve the residents of Fairfax County. *See* Procedural Memorandum # 08–05 at 4 [hereinafter Memorandum]. These limitations are collectively referred to herein as the "use restriction."

2. Plaintiff has chosen to seek a permit only in her individual capacity. She has not sought a permit on behalf of the Christian Civil Liberties Union ("CCLU"), an organization she founded and of which she is the sole member. The record does not disclose whether CCLU, which is not located in Fairfax County, nonetheless serves County citizens in any way.

 The County suggests in its briefs that plaintiff could gain access to the Center Island to erect the crèche or cross simply by registering the CCLU as a nonprofit organization. Because plaintiff's, and thus the organization's, stated goal is spreading the message of "love, hope, and peace," the organization might well be deemed to benefit residents of the County, which is the only requirement for nonprofits who wish to use the space. *See* Memorandum at 4. Alternatively, plaintiff could enlist the aid of a County resident or employee who shares her beliefs and who would submit an application for a use permit on her behalf. Plaintiff has rejected these avenues and has chosen instead to challenge the constitutionality of the use restriction.

3. Plaintiff has been erecting displays at the Capitol for the last seventeen years pursuant to permits issued to the CCLU. Regulations governing Capitol use permits require that displays be attended by an adult at all times.

is unconstitutional. See City of Boerne v. Flores, —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). The second and third counts allege that the County, in enforcing the use restriction, has violated and will continue to violate plaintiff's First Amendment rights to free speech and to petition the government. In her fourth count, plaintiff maintains that the County has violated and will continue to violate her Fourteenth Amendment equal protection rights. On the basis of these allegations and causes of action, plaintiff seeks a permanent injunction prohibiting the County from enforcing the use restriction, and has moved for summary judgment. The County has also moved for summary judgment, claiming that the use restriction is reasonable and thus constitutional in the circumstances. Because the material facts, as recited above, are not in dispute, the matter is now ripe for disposition.

## II

Plaintiff's principal claim is that the County's use restriction violates her First Amendment right to freedom of speech because it precludes her from "speaking" on the Center Island, a public forum. Given this, analysis appropriately begins with the question whether the Center Island is a public forum and, if so, what kind of public forum it is. What follows from answers to these questions is the appropriate level of judicial scrutiny to apply to the County's use restriction.

■ The starting point in the analysis is the well-settled proposition that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." United States Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). Instead, the extent to which individual citizens have the right to express themselves on government property depends on the type of property involved. In this regard, the Supreme Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum. Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). Specifically, the Supreme Court has identified three basic types of government property: the traditional public forum, the designated public forum, and the nonpublic forum. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983).

■ Traditional public fora, such as streets, sidewalks, and parks, are those that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939); see also United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706–07, 75 L.Ed.2d 736 (1983) (noting that traditional public fora include "streets, sidewalks, and parks").[4] In a traditional public forum, the government may exclude speakers only through content-neutral, time/place/manner restrictions, or through content-based restrictions that are narrowly

---

4. The County mistakenly contends that, because the Center Island was created in 1992 when the Complex was built, it cannot be a forum that has "immemorially been held in trust" for the public's use. The quoted phrase, however, refers to the type of property involved, not the specific edifice or plot of land in issue. Were this not so, the nonsensical result would be that no newly constructed park, street, or sidewalk could be considered a traditional public forum.

Moreover, the fact that the Center Island sits directly in front of the County offices does not diminish the protection afforded it. A public forum does not lose its constitutionally protected status just because it "abuts government property that has been dedicated to a use other than as a forum for public expression." Grace, 461 U.S. at 180, 103 S.Ct. at 1708. Compare id. at 179, 103 S.Ct. at 1709 (electing to treat sidewalks outside the Supreme Court like "any other sidewalks in Washington") with Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (holding that streets and sidewalks located within a military reservation are not public fora).

tailored to serve a compelling state interest. *See Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55.

■ Not all public fora are traditional ones. Some fora, though not streets, sidewalks, or parks, are specifically opened by the state or other public authority for expressive activity. These are termed "designated" public fora. *See Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3448–49. Unlike a traditional public forum, the status of a designated public forum is subject to change; a public body that has designated a public forum is not required to "retain the open character of the facility, [but] as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry*, 460 U .S. at 46, 103 S.Ct. at 955; *see also Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448. And the key to whether a public authority has designated a certain area a public forum is its intent. *See Cornelius*, 473 U.S. at 802–03, 806, 105 S.Ct. at 3448–50, 3451.[5] In ascertaining an authority's intent, the factors to be considered include (i) the authority's policy and practice regarding the area in question and (ii) "the nature of the property and its compatibility with expressive activity." *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449.

■ A third type of forum is the nonpublic forum, an area that the government or public authority has not opened up for indiscriminate public use. Here different rules apply. "Access to a nonpublic forum ... can be restricted as long as the restrictions are 'rea-

sonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3447–48 (quoting *Perry*, 460 U.S. at 46, 103 S.Ct. at 955–56). This is because "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida, 385 U.S. 39*, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966).

■ It is readily apparent that the Center Island is not, as plaintiff suggests, a traditional public forum. It is, by definition, neither a street nor a sidewalk. It is also not a park, at least in the traditional sense of that term. It is an enclosed median between the two legs of a U-shaped driveway. As such, it cannot be said that the Center Island is the type of area "immemorially ... held in trust" for the public's use. *See Hague*, 307 U.S. at 515, 59 S.Ct. at 964. Indeed, areas of this sort are designed more for aesthetic purposes such as plantings than for public expressive activity.

It is also readily apparent that the Center Island is not, as defendant urges, a nonpublic forum. The County's Memorandum precludes categorizing the area in this fashion.[6] Instead, the summary judgment record points convincingly to the conclusion that the Center Island is, in general, a designated public forum.

First, the County's policy not only permits but encourages expressive activity on the

**5.** One appellate court has held that while the government's intent is certainly relevant in this regard, it is not dispositive. The Fifth Circuit stated that it is possible for a government entity to "create[], perhaps unwittingly, a public forum from which it [can] not now restrict access." *Concerned Women for America, Inc. v. Lafayette County*, 883 F.2d 32, 34 (5th Cir.1989) (internal quotation marks omitted) (affirming district court's ruling to that effect). That is, once the government opens up the property for expressive activity, it will be deemed to have created a designated public forum, even if that was not its original intent. But a public authority's inaction, by itself, is insufficient to support an inference of intent to designate or create a public forum. *See Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3448–49.

**6.** In this vein, the County's attempt to analogize this case to *United States v. Kokinda*, 497 U.S.

720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), is unavailing. *Kokinda* concerned the status of a sidewalk located on Postal Service property. The Supreme Court found that the sidewalk differed from other "public sidewalks traditionally open to expressive activity" because it was built solely as an access route from the parking lot to the entrance of the Post Office, and because the Postal Service expressly restricted use of the sidewalk to one mode of communication: posting of public notices on bulletin boards. *See* 497 U.S. at 727, 730, 110 S.Ct. at 3119–3120, 3121–22. The Center Island differs sharply from the *Kokinda* sidewalk because Fairfax County has indicated through its Memorandum that the Center Island is intended to be used not just for public notices, but for all sorts of expressive activities. *See* Memorandum at 2.

Island. Thus, the Memorandum states that it is the County's

> policy ... *to encourage use* of the common areas of the Government Center Complex by Fairfax County nonprofit organizations and individual citizens of Fairfax County for civic, cultural, educational, religious, recreational and similar activities of a nonprofit nature ....

Memorandum at 2 (emphasis added). The Memorandum further states that the Center Island is the only area in the Complex where a private individual is permitted to mount a static display, such as plaintiff's crèche. *See* Memorandum at 11. Finally, the Memorandum requires that any display not sponsored by the County be accompanied by a sign stating that it is an individually sponsored display. *See* Memorandum at 11–12. The nature of the Center Island is not inconsistent with this intention. Because it is located close to the seat of government and yet far enough away that activity there would cause no disruption, it is a particularly apt location in which to engage in political or otherwise protected speech.[7] In sum, the record evidence points convincingly to the conclusion that the Center Island is a designated public forum.

■ In opposition, the County notes that the Complex is located in a relatively remote section of Fairfax County where there is likely to be little foot traffic and relatively little use of the Center Island for expressive activity.[8] This, the County suggests, supports its claim that the island is not a designated forum. This argument misses the

mark; it confuses the extent of actual use with the scope of potential and intended use. The constitutional inquiry does not hinge on how many people actually use the Center Island every day to picket or otherwise "speak"; instead, it turns on the County's intended uses for the Center Island, which are described in the Memorandum.

The County further argues that it permits only "limited discourse" on the island, and thus that it has not opened up the area for public expression. *See Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3448–49 ("The government does not create a public forum ... by permitting limited discourse ....").[9] In so arguing, the County relies on the two seminal Supreme Court cases setting out the public forum doctrine, *Perry* and *Cornelius.* In *Perry,* the Supreme Court held that a school's internal mailbox system, though held open to other schools, church groups, and Cub Scout troops, was not a public forum. *See* 460 U.S. at 47, 103 S.Ct. at 956. That case concerned only "selective access"; there was "no indication in the record that the school mailboxes [were] open for use by the general public." *Id.* In *Cornelius,* the Supreme Court held that the federal government's decision to allow 237 organizations—but only those organizations—to participate in the Combined Federal Campaign ("CFC") did not create a designated public forum. *See* 473 U.S. at 806, 105 S.Ct. at 3451. Indeed, the CFC was created to *curb* expressive activity: The government worried that excessive solicitation in federal buildings was

---

7. *See Women Strike for Peace v. Morton,* 472 F.2d 1273, 1287 (D.C.Cir.1972) (Wright, J., concurring) ("There is an unmistakable symbolic significance in demonstrating close to [the seat of government that,] while not easily quantifiable, is of undoubted importance in the constitutional balance."); *cf. ACT–UP v. Walp,* 755 F.Supp. 1281, 1287 (M.D.Pa.1991) ("In general, the grounds and buildings of state and federal capitol complexes and similar buildings have consistently been held to be public fora." (citing *Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736)).

8. The County states that since November 1996, the Center Island has been the subject of only eight requests for use, most of which were made by plaintiff herself or persons acting on her behalf. *See* Deft.'s Resp. at 9. Even more impressive is the fact that only one display has actually

been mounted on the Island—and that was by plaintiff, pursuant to an earlier order in this case granting in part her motion for a preliminary injunction. *See id.* at 28.

9. Plaintiff's rejoinder is worth quoting: "[U]se of the forum is not limited in any manner whatsoever, so long as the use is not unlawful. Cowboys and jugglers, monks and harpists, Nazis and acrobats, painters and soothsayers—all these and all else are invited *and encouraged* by Memorandum # 8–5 to have their say and mount their displays ...." Pl.'s Mem. at 4. Later, plaintiff observes that the cast of characters who could potentially use the Island includes "[m]admen, hustlers, psychopaths, morons, proselytizing zealots, Elvis impersonators, [and] prophets of doom." Pl.'s Mem. at 21.

becoming disruptive to the workplace environment; it thus sought to consolidate and thereby decrease the amount of solicitation on government property. *See* 473 U.S. at 805, 105 S.Ct. at 3450.[10] Both *Perry* and *Cornelius* involved individually identified groups that were permitted to use the government facilities for narrowly defined purposes. Fairfax County, by contrast, opens up the Center Island to all County residents, employees, and nonprofit organizations for a myriad of uses. Indeed, the purpose for which the grounds may be used appears almost unlimited. *See* Memorandum at 2 (permitting "civic, cultural, educational, religious, recreational and similar activities"). In allowing for this unbridled use of the Center Island, the County has designated it a public forum.

▆▆▆▆ Yet this conclusion does not end the analysis, for within the Supreme Court's "forum" jurisprudence is a subspecies of the designated forum, namely the "limited public forum." *See Perry*, 460 U.S. at 46 n. 7, 103 S.Ct. at 955 n. 7.[11] A limited public forum is one that is "created for a limited purpose such as [for] use by certain groups," *Perry*, 460 U.S. at 46 n. 7, 103 S.Ct. at 955 n. 7, or "for use by certain speakers," *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449.[12] Within that context, the state "may legally preserve the property under its control for the use to which it is dedicated." *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390, 113 S.Ct. 2141, 2146, 124 L.Ed.2d 352 (1993). Although the Memorandum evinces the County's intention to designate the Center Island as a public forum, it also evinces an intention to limit the scope of

that designation to include only certain entities. Nor is such a limitation automatically suspect, as

> [t]he necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics.

*Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995) (citations omitted). Because the Memorandum limits use of the Complex to County residents, employees, and nonprofit organizations, it is apparent that the Center Island has as its "limited and legitimate purpose[]" service to those individuals and groups who have some relation with Fairfax County. The County, by promulgating the Memorandum, made unmistakably clear its intention to create a limited public forum in the Center Island. Because that intention controls, the Center Island is a limited public forum.

### III

▆▆▆▆ The next step in the analysis examines the circumstances in which such restrictions on expressive activity in a limited public forum are permitted. In general, a public authority that limits a designated public forum to accomplish a reasonable and legitimate purpose is "subject to only minimal constitutional scrutiny." *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 229 (2d Cir.1996) ("Where the speaker does not come within that purpose [for which the forum was created], the State is subject to only minimal constitutional scrutiny."). More specifically, "in a limited public forum, government is

---

10. *See also Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. # 5*, 941 F.2d 45, 48 (1st Cir. 1991) (characterizing *Cornelius* as a case in which the government created the forum to advance certain limited, special purposes of its own").

11. *See also International Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992) (observing that designated fora may be "of a limited or unlimited character"); *Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1118 (3rd Cir.1992) (noting that the "'limited public forum' [is] a subset type of designated public forum").

12. *See also Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267, 108 S.Ct. 562, 567–68, 98 L.Ed.2d 592 (1988) (stating that public fora are created when "authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public,' *or by some segment of the public* " (quoting *Perry*, 460 U.S. at 47, 103 S.Ct. at 956) (emphasis added)); *Widmar v. Vincent*, 454 U.S. 263, 267, 102 S.Ct. 269, 273, 70 L.Ed.2d 440 (1981) (holding that university created public forum for use by student groups); *cf. id.* at 268 n. 5, 102 S.Ct. at 273–74 n. 5 ("We have not held, for example, that a campus must make all of its facilities equally available to students and nonstudents alike . . . .").

free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." *Travis v. Owego–Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir.1991). In other words, "[w]hen the government ... creates a limited public forum for the use of certain speakers ... the first amendment protections provided to traditional public forums only apply to entities of a character similar to those the government admits to the forum." *Calash v. City of Bridgeport*, 788 F.2d 80, 82 (2d Cir.1986). Exclusion of other speakers need only be viewpoint-neutral and "reasonable in light of the purpose served by the forum." *Rosenberger*, 515 U.S. at 829, 115 S.Ct. at 2517 (internal quotation marks omitted).[13] Thus, there is "a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of [the] limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations." *Id.* at 829–30, 115 S.Ct. at 2517. In short, content-based restrictions are permissible in a limited public forum, provided they are consistent with the purposes of the forum, but viewpoint-discriminatory restrictions are impermissible.[14]

**13.** *See also Deeper Life Christian Fellowship, Inc. v. Board of Educ.*, 852 F.2d 676, 679 (2d Cir. 1988) ("Under the limited public forum analysis, property remains a nonpublic forum as to all unspecified uses, and exclusion of uses—even if based upon subject matter *or the speaker's identity*—need only be reasonable and viewpoint-neutral to pass constitutional muster." (citations omitted) (emphasis added)).

**14.** The limited public forum doctrine thus embodies a combination of the rules that apply to public fora and those that apply to nonpublic fora. In a limited public forum, the government must grant equal access to all speakers who fall within the scope of the designation. *See Calash*, 788 F.2d at 82. This is the same standard imposed with respect to public fora. *See Perry*, 460 U.S. at 46, 103 S.Ct. at 955–56 (asserting that speakers cannot be excluded from a public forum without a compelling state interest). By contrast, those speakers who do not fall within the scope of intended purpose of the limited forum may be excluded provided the restriction is reasonable and viewpoint-neutral. *See Rosenberger*, 515 U.S. at 830, 115 S.Ct. at 2517. The same standard applies to nonpublic fora. *See Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3447–48 ("Access to a nonpublic forum ... can be restricted as a long as the restrictions are 'reasonable and ... not an effort to suppress expression merely because public officials oppose the speaker's view.'" (quoting *Perry*, 460 U.S. at 46, 103 S.Ct. at 955)).

This analysis arguably suggests that the limited public forum doctrine grants the state almost unfettered discretion in the extent to which it chooses to open up its property for public expressive activity. As *Cornelius* teaches, the driving concern in determining a forum's status is the government's intent. *See* 473 U.S. at 802, 105 S.Ct. at 3448–49. However, if the government intends to open up a forum only for certain topics, or only to certain people, then by definition any plaintiff who is excluded under the government's regulations will lose a First Amendment challenge (unless the regulations are viewpoint discriminatory), for that plaintiff will fall outside the limited scope of intended use of the forum. As one commentator has put it:

> [T]he focus on intent [in *Cornelius*] had the virtue of candor, for it tactfully withdrew the concept of the limited public forum as a meaningful category of constitutional analysis. If a limited public forum is neither more nor less than what the government intends it to be, then a first amendment right of access to the forum is nothing more than the claim that the government should be required to do what it already intends to do in any event.

Robert C. Post, *Between Governance and Management; The History and Theory of the Public Forum*, 34 UCLA L.Rev. 1713, 1756–57 (1987).

Arguably, then, the limited public forum in effect swallows the designated public forum as the intermediate category in the Supreme Court's forum jurisprudence. This result obtains because what might originally have been cast an unconstitutional content-based restriction in a designated forum can be recharacterized as a valid content-based exclusion in a limited public forum. Few restrictions, then, will be scrutinized under a designated-forum approach, because the government will simply assert that the provisions at issue are valid limited-forum restrictions. And because content-based limitations are treated the same in limited public fora and in nonpublic fora, those two categories collapse into one another. *See Post, supra*, at 1754 (arguing that *Perry* does "not ... distinguish[] limited public forums from nonpublic forums"). Indeed, in terms of the "selective access" that characterizes a nonpublic forum, *see Perry*, 460 U.S. at 47, 103 S.Ct. at 956, *Perry* gave "no hint as to how the 'opening up' that creates a limited public forum differs from the 'opening up' that leaves a forum nonpublic." Post, *supra*, at 1755; *see also Cornelius*, 473 U.S. at 825, 105 S.Ct. at 3461 (Blackmun, J., dissenting) (arguing that the majority's decision left only two viable categories, the public forum and the nonpublic

Viewpoint discrimination consists of state action in which there is no ban on a "general subject matter," but only on one or more "prohibited perspective[s]." *See Rosenberger*, 515 U.S. at 831, 115 S.Ct. at 2517–18.[15] When government restrictions "target[] not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829, 115 S.Ct. at 2516 (citation omitted). These principles mandate that the government not discriminate against particular viewpoints, even when acting within a limited public forum that the government itself has created. *See Rosenberger*, 515 U.S. at 829, 115 S.Ct. at 2516–17.

■ The central question, then, is whether the County's use restriction discriminates among viewpoints. It plainly does not. Nothing in the record suggests that Fairfax County is attempting to muffle specific ideas or topics; indeed, given the cultural and political diversity of the County, one might assume that the mass of County residents and employees holds quite divergent views on innumerable issues of public concern. The Memorandum does not attack "particular views taken by speakers," *Rosenberger*, 515 U.S. at 828, 115 S.Ct. at 2516; instead it excludes particular speakers, namely those who do not have the requisite relation with the County, no matter what views they may hold. Accordingly, the use restriction in the Memorandum is a viewpoint-neutral regulation.

forum). Thus the Supreme Court's tripartite framework for forum analysis devolves into a binary schema, in which all fora are either public or limited, and in the latter case, the restrictions are subject to only minimal constitutional scrutiny. *See Cornelius*, 473 U.S. at 814, 105 S.Ct. at 3455 (Blackmun, J., dissenting) (contending that the majority's decision "reduces to this: when the Government acts as the holder of public property other than streets, parks, and similar places, the Government may do whatever it reasonably intends to do, so long as it does not intend to suppress a particular viewpoint"); *cf. Kokinda*, 497 U.S. at 741, 110 S.Ct. at 3127 (Brennan, J., dissenting) (providing a survey of academic literature criticizing the Supreme Court for adhering too much to "formalistic labels" in its public forum jurisprudence).

■ To satisfy the test of *Rosenberger* quoted above, then, and thus to pass constitutional muster, the use restriction need only be "reasonable in light of the purposes served" by it. *See* 515 U.S. at 829, 115 S.Ct. at 2516–17; *see also Multimedia Pub. Co. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir.1993) (discussing reasonableness standard for nonpublic fora and holding that the "challenged regulation must be assessed 'in light of the purpose of the forum and all the surrounding circumstances.' " (quoting *Cornelius*, 473 U.S. at 809, 105 S.Ct. at 3452–53)). This inquiry requires consideration of the extent of the restriction on speech imposed by the Memorandum and the alternatives for expression that are left open by the use restriction, all with the goal of respecting, if possible, the intended purposes of the forum. *See Multimedia*, 991 F.2d at 159.

First, the regulation certainly leaves open alternative channels of expression: plaintiff could erect her displays in traditional fora located elsewhere in Fairfax County; or she could address the Board of Supervisors, the County's governing body, at one of its public hearings; or she could enlist the aid of a County-affiliated individual or organization to secure a use permit. None of these alternatives is burdensome, and each is readily available to plaintiff.

Second, the use restriction is reasonable in light of the purposes served by the Center Island.[16] The Government Center Complex was presumably built with funds provided by the citizens of Fairfax County, and those

**15.** *See also Perry*, 460 U.S. at 59, 61, 103 S.Ct. at 962–63, 963–64 (Brennan, J., dissenting) (stating that "content neutrality prohibits the government from choosing the subjects that are appropriate for public discussion," whereas viewpoint neutrality proscribes discrimination "among viewpoints on those topics" that are chosen).

**16.** It is important to note that, contrary to plaintiff's suggestion, analysis of the County's interests is properly conducted with reference to their reasonableness in general, not their reasonableness vis-à-vis plaintiff's particular display. *See Rosenberger*, 515 U.S. at 829, 115 S.Ct. at 2516–17.

citizens' tax dollars support the maintenance of the Complex, including the Center Island. The Complex was constructed to benefit those individuals, and thus the restriction understandably limits use of the forum to them. Indeed, it only makes sense that a local government would be permitted to restrict use of its facilities to its constituents. *See Cornelius*, 473 U.S. at 806, 105 S.Ct. at 3451 (stating that government may exclude a speaker "if he is not a member of the class of speakers for whose especial benefit the forum was created"[17]); *cf. Multimedia*, 991 F.2d at 160 (stating that restrictions may be justified by "appeals to common sense and logic"). In addition, the exclusion of non-County speakers from the forum means that the County will save money in maintaining and supervising the Center Island, given the smaller number of people who will use the area. This, too, is a reasonable government interest. Finally, the Center Island is located directly in front of the Government Center Building, the seat of County government. It is manifestly reasonable for the County to want to restrict access to an area so close to where it conducts its everyday business. For all of these reasons, the use restriction is a constitutional, viewpoint-neutral regulation.

## IV

▆▆▆▆ Even assuming that the Center Island is a designated public forum, and not a limited public forum, the use restriction would still withstand constitutional scrutiny. In a designated public forum, the government cannot impose restrictions on the use of that forum unless the restrictions are either content-neutral (as, for example, are reasonable time/place/manner restrictions), or content-based and can survive a strict scrutiny analysis. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54,

105 L.Ed.2d 661 (1989); *Perry*, 460 U.S. at 46, 103 S.Ct. at 955–56.[18] This is so "even if [the government] was not required to create the forum in the first place." *Perry*, 460 U.S. at 45, 103 S.Ct. at 955.

Under this test, the County could first attempt to justify its use restriction by arguing that the restriction relates only to the time, place, or manner of the expression permitted in the Center Island. Given, however, that a County employee or resident could mount the exact same display that plaintiff seeks to erect at the same time and place and in the same manner as plaintiff proposes, the use restriction cannot be a time/place/manner regulation; if it were, then the restriction that precludes plaintiff's expression would also preclude a County resident from engaging in the same expressive conduct. Indeed, plaintiff is not foreclosed from displaying the crèche because she wants to do it in the middle of the night; nor because she wants to do it in the middle of the driveway; nor because she wants it to be three stories high. Instead, she is prevented from expressing herself because she is neither a resident nor an employee of Fairfax County.

Nor is the County's use restriction properly treated as a content-based restriction.[19] Speaker-based restrictions such as those found here do "not fit neatly within the Court's content-based/content-neutral distinction." Geoffrey R. Stone, *Content Regulation and the First Amendment*, 25 WM. & MARY L.REV. 189, 244 (1983) (discussing speaker-based restrictions).[20] To be sure, the restrictions are not what would one conceive of as "typical" content-based regulations, such as "No Political Demonstrations" or "No Commercial Advertising." Although the Supreme Court has been presented with speaker-based restrictions in several cases, it "has

---

**17.** Though this statement was made in the context of a nonpublic forum, it applies equally to a limited public forum. *See supra* note 14.

**18.** Of course, content-based restrictions are generally disfavored in the First Amendment context. *See, e.g., Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).

**19.** The parties have not cited, nor has research disclosed, any cases discussing the constitutional

character of geographic limitations such as those involved here. Thus, the question whether such a use restriction is content-based or content-neutral appears to be one of first impression.

**20.** *See id.* at 250–51 (suggesting five different ways one might choose to categorize and analyze speaker-based restrictions within the content-based/content-neutral framework).

given the issue [of whether they constitute content-based provisions] scant attention." [21]

· Recent Supreme Court cases teach that, instead of categorically defining speaker-based restrictions as either content-based or content-neutral, reference should be made to the nature of the restriction and the criteria that inform it. For example, in *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), Arkansas had enacted a statute that exempted from certain taxes all newspapers and all sports, trade, and religious magazines. A nonexempt publication challenged the statute, arguing that it unconstitutionally hindered the nonexempt publication's freedom of expression by rendering more costly the exercise of its First Amendment rights. The Supreme Court held the exemption an unconstitutional content-based restriction because the state differentiated among groups of the press solely on the basis of the subject matter the publications discussed. *See id.* at 229 ("[T]he basis on which Arkansas differentiates between magazines is particularly repugnant to First Amendment principles: a magazine's tax status depends entirely on its *content.*"). In *Turner Broadcasting Sys., Inc. v. FCC,* 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), the Supreme Court found a speaker-based law [22] content-neutral

because its operation did not hinge on the message the excluded speakers sought to express. *See* 512 U.S. at 645–52, 114 S.Ct. at 2460–64. The Supreme Court observed that "speaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." 512 U.S. at 658, 114 S.Ct. at 2467.[23] There is nothing of that sort here, for there is nothing in the record to suggest that the County's policy is designed to, or has the effect of, excluding certain · views ·from · the marketplace of ideas.[24]

Moreover,

[a] regulation that serves purposes unrelated to the content of expression is · deemed neutral, even if it has an incidental effect on some speakers or messages but not others. Government regulation of expressive activity is content neutral so long · as it is justified without .reference to the content of the regulated speech.

*Ward,* 491 U.S. at 791, 109 S.Ct. at 2753–54 (internal quotation marks, citation, and emphasis omitted); *see also Turner,* 512 U.S. at 643, 114 S.Ct. at 2459–60 ("By contrast, laws that confer benefits or impose burdens on

**21.** Stone, *supra,* at 245 (citing *Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980); *Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *First Nat'l Bank v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)).

**22.** The Cable Television· Consumer Protection and Competition Act of 1992, Pub.L. 102–385, 106 Stat. 1460, required cable television systems to dedicate a certain portion of their channels to local broadcast stations.

**23.** *See also Turner,* 512 U.S. at 675, 114 S.Ct. at 2475–76 (O'Connor, J., dissenting in part) ("I agree with the Court that some · speaker-based restrictions—those genuinely justified without reference to content—need not be subject to strict scrutiny."); *Regan v. Taxation With Representation of Wash.,* 461 U.S. 540, 548, 103 S.Ct. 1997, 2002, 76 L.Ed.2d 129 (1983) (rejecting a First Amendment challenge to favorable tax treatment for veterans' groups, noting that the case would be different were there any "indication that the statute was intended to suppress any ideas or any demonstration that it has had that

effect"); *cf.* Laura V. Farthing, Note, Arkansas Writers' Project v. Ragland: *The Limits of Content Discrimination Analysis,* 78 Geo. L.J.1949, 1964 n. 65 (1990) ("[A] speaker's identity is not 'content' in the same, inevitable way that subject matter or a viewpoint expressed in a particular speech is content, because a speaker's views or likely topic may not be readily identifiable and may change over time.").

**24.** A geographic restriction such as the one at issue here might be deemed content-based if it were clear on the record that the restriction would have the effect of silencing a particular .point of view. For instance, a use restriction that distinguished between affluent and poor sections of a municipality ,might lead to a different result: such a restriction not only would constitute an exclusion of a category of speakers, but it might also result in viewpoint discrimination. For example, if the regulation at issue did not distinguish between Fairfax County and Fairfax City, but instead between Georgetown, an affluent enclave of Washington, and Anacostia, one of the city's poorest sections, the restriction may well amount to viewpoint discrimination. That scenario, of course, is not presented here.

speech without reference to the ideas or views expressed are in most instances content-neutral."). The use restriction here evidently is not directed at the content of the expression; furthermore, there is nothing to indicate that it has even an "incidental effect" on the type of speech in which non-County individuals wish to engage. The fact that a County resident or nonprofit group could mount the very same crèche that plaintiff seeks to erect, without violating the County's use restriction, provides further evidence that the regulations are not content-based.[25] Thus, given that the use restriction constitutes a permissible content-neutral restriction, it would survive plaintiff's First Amendment attack, even if the Center Island were treated as a designated public forum.[26]

It follows inexorably from this conclusion that plaintiff's Equal Protection Clause challenge falls short as well. Because plaintiff has no First Amendment right to speak in the Center Island, the County's use restriction does not burden a fundamental right.[27] And because the use restriction rationally furthers a legitimate state interest, as discussed above, it passes constitutional muster. *See Perry*, 460 U.S. at 54, 103 S.Ct. at 959–60; *see also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973) (setting out strict-

scrutiny/rational-basis framework for equal protection claims). In short, once plaintiff's First Amendment argument is rejected, "it fares no better in equal protection garb." *Perry*, 460 U.S. at 54, 103 S.Ct. at 960.

## V

■ There is a final restriction on use of the Center Island, one not related to residence or employment, that merits attention. The Memorandum requires that any person mounting a static display in the Center Island attend it, that is stand by it, at all times. Plaintiff attacks this requirement as an unreasonable time/place/manner restriction. This claim is meritless. The attendance requirement does not foreclose any particular type of speech; it simply prescribes the way in which any speaker must use the Center Island. As such, the requirement is a content-neutral "manner" regulation, and thus need only be "narrowly tailored to serve a significant government interest[] and leave open ample alternative channels of communication." *Grace*, 461 U.S. at 177, 103 S.Ct. at 1707.

The government's evident interests here are ample and significant. These include (i) providing a means for preventing destruction of the display in the face of poor weather or vandalism;[28] (ii) ensuring that viewers un-

**25.** This does not mean, however, that in a different context just because one speaker might address the same issues an excluded speaker wishes to address, the latter's freedom of expression has not been curtailed. *See Arkansas Writers'*, 481 U.S. at 230–31, 107 S.Ct. at 1728–29; *see also Perry*, 460 U.S. at 49, 103 S.Ct. at 957 (noting that restrictions based on speaker identity "may be impermissible in a public forum"). In those situations, " '[i]t hardly answers one person's objection to a restriction on his speech that another person, outside his control, may speak for him.' " *Arkansas Writers'*, 481 U.S. at 231, 107 S.Ct. at 1728–29 (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 553, 103 S.Ct. 1997, 2004–05, 76 L.Ed.2d 129 (1983) (Blackmun, J., concurring)).

**26.** It is worth repeating that this conclusion provides an *alternate* basis for the holding that the use restriction is not unconstitutional. Even if the restriction were content-based, contrary to the foregoing discussion, it would nonetheless remain viewpoint-neutral. And that fact would carry the County over any constitutional hurdle because the Center Island is a limited public

forum. *See Rosenberger*, 515 U.S. at 830, 115 S.Ct. at 2517.

**27.** Plaintiff's reliance on equal protection cases holding that aliens enjoy many of the same constitutional freedoms as do citizens, *see, e.g., Underwager v. Channel 9 Austl.*, 69 F.3d 361, 365 (9th Cir.1995), is misplaced. The analogy is flawed because it effectively assumes away the existence of a limited public forum. The proper analogy would focus on the extent of an alien's rights in a traditional public forum. In that context, the County could restrict neither a non-U.S. citizen nor a non-Fairfax County citizen from expressing herself. By contrast, in a limited public forum, the government can exclude both. Thus plaintiff's argument puts the cart before the horse: it assumes that there exists some "general" First Amendment right to speak in the Center Island, and then asserts that this right is being denied. The discussion above, however, demonstrates that no such right exists.

**28.** Notably, the unattended cross at issue in *Capitol Square Review and Advisory Bd. v. Pinette* was vandalized the day after it was erected in the

derstand that an individual, and not the County, is responsible for the display;[29] (iii) saving money on maintaining and monitoring the display; and (iv) ensuring that someone is available to answer questions about the display. Moreover, as discussed above in the context of the use restriction, any restriction that precludes plaintiff from expressing herself in the Center Island leaves open alternative channels of communication. Here the exclusion is even narrower than that found in the use restriction: whereas that latter policy forecloses all expression in the forum for some speakers, the attendance requirement permits expression as long as the speaker complies with its strictures.[30] Finally, and perhaps most important, the Supreme Court has recently indicated that a similar attendance requirement would likely survive constitutional scrutiny. *See Capitol Square,* 515 U.S. at 761, 115 S.Ct. at 2446 (opinion that "a ban on all unattended displays ... might be one such [reasonable, content-neutral restriction]"); *id.* at 784, 115 S.Ct. at 2457 (Souter, J., concurring in part) (observing that the state may "clos[e] the square to all privately owned, unattended structures").

## VI

To summarize, the Center Island is a limited public forum. Thus, Fairfax County can exclude certain speakers from the area as long as the restrictions it promulgates are viewpoint-neutral. The County's use restriction satisfies this requirement. Moreover, even if the Center Island were a designated (and not a limited) public forum, the County would still be able to enact and enforce the use restriction because it is not content-based. Finally, the requirement that an adult attend any static display at all times is a reasonable manner regulation. Accordingly, plaintiff's First Amendment and Equal Protection challenges must fail.

An appropriate order will issue.[31]

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

---

public forum. *See* 515 U.S. 753, 797 n. 2, 115 S.Ct. 2440, 2465 n. 2, 132 L.Ed.2d 650 (1995) (Stevens, J., dissenting).

**29.** It is worth recalling that the Memorandum also requires that the "speaker" place a sign next to the display stating that the display has been erected on behalf of an individual, and not on behalf of the County. *See* Memorandum at 11–12

**30.** Though plaintiff and others certainly would have even greater freedom of expression were there no attendance policy at all, manner regulations are not "invalid simply because there is some imaginable alternative that might be less burdensome on speech." *Ward,* 491 U.S. at 797, 109 S.Ct. at 2757 (internal quotation marks omitted).

**31.** The parties have previously submitted to the Court a proposed consent order that would grant plaintiff the right to use the Center Island during the upcoming Christmas season pending resolution of the cross-motions for summary judgment. In light of the Order accompanying this Memorandum Opinion disposing of the summary judgment motions, the parties' proposed consent order is moot.