**CORRECTED OPINION**

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RITA WARREN,
Plaintiff-Appellant,

v.                                                                    No. 98-1059

FAIRFAX COUNTY,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CA-97-119-A)

Argued: June 9, 1999

Decided: October 13, 1999
Corrected Opinion Filed October 28, 1999

Before WILKINSON, Chief Judge, and WIDENER,
MURNAGHAN, ERVIN,* NIEMEYER, HAMILTON, LUTTIG,
WILLIAMS, MICHAEL, MOTZ, TRAXLER, and KING,
Circuit Judges.

_____

Reversed by published opinion. Judge Murnaghan wrote the majority
opinion, in which Chief Judge Wilkinson and Judges Hamilton, Lut-
tig, Michael, Motz, Traxler, and King joined. Chief Judge Wilkinson
wrote a concurring opinion. Judge Niemeyer wrote a dissenting opin-
ion, in which Judges Widener and Williams joined.

_____

CORRECTION MADE ON COVER SHEET
_____

*Judge Ervin heard oral argument in this case but died prior to the
time the decision was filed.

**COUNSEL**

**ARGUED:** Victor Michael Glasberg, VICTOR M. GLASBERG & ASSOCIATES, Alexandria, Virginia, for Appellant. James Patrick Taves, Senior Assistant County Attorney, Fairfax, Virginia, for Appellee. **ON BRIEF:** Jeanne Goldberg, VICTOR M. GLASBERG & ASSOCIATES, Alexandria, Virginia, for Appellant. David P. Bobzien, County Attorney, Karen L. Gibbons, Assistant County Attorney, Fairfax, Virginia, for Appellee.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Stretching in front of the Fairfax County Government Center Complex is a large grassy mall, approximately thirty yards wide and spanning about 200 yards (the "Center Island mall" or the "mall"). Sidewalks circumnavigate the mall and amble along a central landscaped strip. The area of the mall abutting the Government Center Complex features a circular brick promenade complemented by additional landscaping. Surrounding the mall is the street which leads to the Government Center Complex. The entire mall is outdoors, unenclosed, publicly accessible, and in fact open to the public.

In November 1996 Rita Warren, a resident of Fairfax City, filed for a permit to erect a holiday display on the Center Island mall. Fairfax County (the "County") and Fairfax City are separate jurisdictions in Virginia. Fairfax City is much smaller than the County and is surrounded in its entirety by the County. Fairfax County Procedural Memorandum No. 08-05 (Nov. 18, 1996) (the "Memorandum") governs use of the Center Island mall. The Memorandum states that it is County policy "to encourage use of the common areas of the Government Center Complex by [qualified persons] for civic, cultural, educational, religious, recreational and similar activities . . . ." Memorandum, at 2. The Memorandum limits the scope of qualified persons to county residents, county employees, and county nonprofits, defined as "[a]ny nonprofit organization which has an office in Fairfax County and/or serves the citizens of Fairfax County . . . ."**1**

_____

**1** For ease of reference, the qualified persons restriction in the Memorandum will sometimes be referred to as a "residency restriction" or

2

Memorandum, at 4. Because Warren was not a resident or employee of the County, the County denied Warren permission to engage in First Amendment activity on the Center Island mall.

Warren filed suit in the federal district court for the Eastern District of Virginia, challenging the County's action as a violation of her Fourteenth Amendment rights of freedom of speech and equal protection. The district court initially granted Warren a preliminary injunction against enforcement of the Memorandum as applied to the Center Island mall. Later, however, the district court held in favor of the County. See Warren v. Fairfax County, 988 F. Supp. 957 (E.D. Va. 1997). The district court reasoned that the Center Island mall was not a traditional public forum, but instead was a designated limited public forum, and Warren was not a member of the class to whom the Center Island had been opened. See id. at 962-64. Further, the district court held that the residency restriction in the Memorandum passed constitutional muster because it was reasonable and viewpoint neutral. See id. at 964-67.

On appeal, a divided panel of this Court affirmed the district court. See Warren v. Fairfax County, 169 F.3d 190 (4th Cir. 1999). The panel decision was vacated on April 21, 1999, when the Court granted Warren's petition for rehearing en banc. Now, the Court adopts as its own sections II, III(A), III(B), and III(C) of the dissenting panel opinion, appended to this opinion.**2** We hold that the Center Island mall is a traditional public forum under the law detailed in section II of that opinion. See Warren, 169 F.3d at 197-201 (Murnaghan, J., dissenting) [hereinafter, all references to Warren are to the panel dissent].

The Center Island mall has the physical characteristics of a traditional public forum. See, e.g., Int'l Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 686 (1992) (O'Connor, J., concurring in ISKCON v. Lee and concurring in the judgment in Lee v. Int'l Society of Krishna Consciousness, Inc., 505 U.S. 830 (1992)); United States v. Kokinda, 497 U.S. 720, 727 (1990) (plurality opinion). It is

_____

"residents-only policy."

**2** The adoption of these sections of the dissent obviates the need to consider the arguments raised in the other sections.

3

an open public thoroughfare best characterized as a park or mall. See Warren, 169 F.3d at 198-99, 201.

The Center Island mall has the objective[3] use and purpose of a traditional public forum. See Warren, 169 F.3d at 198-99, 202. Its objective use is as a place of open public access, which is eminently compatible with expressive activity. See Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 678, 118 S. Ct. 1633, 1641 (1998).

Finally, the Center Island mall is part of a class of property which by history and tradition has been open and used for expressive activity. See Warren, 169 F.3d at 198-99, 202. The Center Island mall is part of the outdoor grounds of a seat of legislative and/or executive power. See id. at 202.

Alternatively, the Center Island mall is a traditional public forum because it is merely a combination of the three prototypical examples of traditional public fora -- streets, sidewalks, and parks. See id. at 203-04.

The designation of an area as a traditional public forum does not prevent localities from addressing such significant concerns as public safety and the movement of traffic. The Supreme Court has made clear

> that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."

Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984)). The restriction here fails because it is not narrowly tailored

---

[3] The term "objective" in this context means "without reference to the attempted restriction on speech." See Warren , 169 F.3d at 198 n.4.

to achieve a significant state interest. See Warren, 169 F.3d at 204-05. Also, under Arkansas Educational Television Commission v. Forbes, a state entity cannot exclude a speaker from a traditional public forum altogether unless "`the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.'" Forbes, 523 U.S. at 677 1641 (quoting Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 800 (1985)). Here, the exclusion of non-residents passes neither prong -- it serves no compelling interests and it is not narrowly tailored to achieve the interests that it does serve. See Warren, 169 F.3d at 204-05.

Accordingly, we strike down the Memorandum as violative of First and Fourteenth Amendment rights insofar as it applies to the Center Island mall. The district court by en banc majority opinion is

REVERSED.

ADDENDUM

Parts II AND III of Judge Murnaghan's dissent
from the panel opinion reported at 169 F.3d 190.

II.

The Supreme Court recently confirmed that courts should evaluate First Amendment rights on government-owned property under a public forum analysis. See Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. ___, ___, 118 S. Ct. 1633, 1641 (1998). The public forum analysis was created to recognize that the government must be able to limit the use of its property to the intended purpose for which the property was created, see, e.g., Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 800 (1985); Adderley v. Florida, 385 U.S. 39, 48 (1966), and to limit access to those rightfully conducting business there, see, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 53 (1983). Toward that end, the Court has identified at least three types of fora for First Amendment purposes, each subject to a different regime of constitutional scrutiny: the traditional public forum, the designated public forum, and the non-public forum. Ark. Educ., 523 U.S. at ___, 118 S. Ct. at 1641 (quoting

5

Cornelius, 473 U.S. at 802). The Court distinguishes between these fora based upon the physical characteristics of the property, including its location, see, e.g., Frisby v. Schultz, 487 U.S. 474, 480-481 (1988); United States v. Grace, 461 U.S. 171, 177, 179 (1983); the objective[4] use and purposes of the property, see, e.g., Ark. Educ., 523 U.S. at ___, 118 S. Ct. at 1641; Cornelius, 473 U.S. at 800, 805, 809; and government intent and policy with respect to the property, which may be evidenced by its historic and traditional treatment, see, e.g., Int'l Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 680-681 (1992). None of these factors is dispositive. See United States v. Kokinda, 497 U.S. 720, 727 (1990) (plurality opinion) (physical characteristics of property not dispositive); Grace , 461 U.S. at 177 (fact that property is subject to use by general public is not dispositive); Lee v. Int'l Society for Krishna Consciousness, Inc. , 505 U.S. 830 (1992) (government policy prohibiting distribution of literature on property struck down); Cornelius, 473 U.S. at 805 (government's decision to limit access is not itself dispositive).

Traditional public fora have objective characteristics which "require the government to accommodate private speakers." Ark Educ., 523 U.S. at ___, 118 S. Ct. at 1641. See also ISKCON v. Lee, 505 U.S. at 686 (O'Connor, J., concurring in ISKCON v. Lee and concurring in the judgment in Lee v. ISKCON) (Public access to traditional public fora is "'`inherent in the open nature of the locations'") (quoting Kokinda, 497 U.S. at 743 (Brennan, J., dissenting)). The typical traditional public forum is property which has the physical characteristics of a public thoroughfare, see, e.g., Kokinda, 497 U.S. at 727 (plurality opinion), which has the objective use and purpose of open public access or some other objective use and purpose inherently compatible with expressive conduct, see, e.g., Ark. Educ., 523 U.S. at ___, 118 S. Ct. at 1641, and which by history and tradition has been used for expressive conduct, see, e.g., Perry, 460 U.S. at 45. The archetypical examples of traditional public fora are streets, sidewalks, and parks:

_____

**4** The term "objective" in this context means, "without reference to the attempted restriction on speech". The restriction on speech cannot be used to justify itself, but must be justified by reference to some non-speech-restrictive aspect of the forum. See, e.g., Int'l Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 691 (1992) (O'Connor, J., concurring in ISKCON v. Lee and concurring in the judgment in Lee v. ISKCON, 505 U.S. 830 (1992)).

6

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

Hague v. C.I.O., 307 U.S. 496, 515-16 (1939). See also Grace, 461 U.S. at 177. Since it is so likely that any given street, sidewalk, or park meets all three characteristics of a traditional public forum a court can generally treat a street, sidewalk, or park as a traditional public forum without making a "particularized inquiry". See Frisby v. Schultz, 478 U.S. at 481; Grace, 461 U.S. at 179-180; ISKCON v. Lee, 505 U.S. at 697 (Kennedy, J., concurring in the judgments in ISKCON v. Lee and Lee v. ISKCON). Occasionally, further inquiry may be necessary even when property has the physical characteristics of a traditional public forum and is generally open to public traffic. For instance, neither a sidewalk on a military base over which the military has retained control, compare Greer v. Spock, 424 U.S. 828 (1976), with Flower v. United States, 407 U.S. 197 (1972) (per curiam), cited with approval in Greer, 424 U.S. at 835, nor a single-purpose sidewalk physically separated from the rest of municipal sidewalks and part of a class historically subject to restrictions, see Kokinda, 497 U.S. 720 (plurality opinion),**5** are traditional public fora.

The Supreme Court has recently stated that traditional public forum status does not "extend[ ] beyond its historic confines ...." Ark. Educ., 523 U.S. at ___, 118 S. Ct. at 1641. The Court has never precisely stated what those confines are, however. For instance, the Court has never defined the terms "street," "sidewalk," or "park." Nor has the Court strictly limited the traditional public forum category to streets, sidewalks, and parks. See Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546 (1975) (leased municipal theater is a public forum);

_____

**5** It is notable, though, that five Justices evaluated the restriction at issue in Kokinda under the traditional public forum standard. See Kokinda, 497 U.S. at 737 (Kennedy, J., concurring in the judgment); id. at 740 (Brennan, J., dissenting, joined by Marshall, Stevens, and, in part, Blackmun).

7

Heffron v. Int'l Society for Krishna Consciousness, Inc., 452 U.S. 640 (1981) (state fair is a public forum); Edwards v. South Carolina, 372 U.S. 229 (1963) (grounds of state capitol are a traditional public forum).

Access to traditional public fora may be limited only by content-neutral and "reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions ...`are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Community for Creative Nonviolence, 468 U.S. 288, 293 (1984)). Exclusion on the basis of speaker-identity is valid only where the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. Ark. Educ., 523 U.S. at ___, 118 S. Ct. at 1641 (quoting Cornelius, 473 U.S. at 800).

The second category is the nonpublic forum. Some Supreme Court precedent indicates that all government properties which are not traditional public fora and which the government has not intentionally opened to expressive conduct are nonpublic fora. See ISKCON v. Lee, 505 U.S. at 680. But see Kokinda, 497 U.S. at 738-39 (Kennedy, J., concurring in the judgment) (objective characteristics and customary use by the public may control forum designation over government intent). Accord ISKCON v. Lee, 505 U.S. at 693 (Kennedy, J., concurring in the judgments in ISKCON v. Lee and Lee v. ISKCON). Covering such a wide variety of property, it is difficult to narrow the exact physical characteristics,**6** objective uses and purposes, and government intent that must characterize nonpublic fora. One characteristic has been assumed in all of the Supreme Court cases that address the issue, however: opening the nonpublic forum to expressive conduct will somehow interfere with the objective use and purpose to which the property has been dedicated.**7**See, e.g., Ark. Educ., 523 U.S. at

_____

**6** A forum need not have a physicalexistence. See, e.g., Ark. Educ., 523 U.S. ___, 118 S. Ct. 1633 (public access debate); Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819 (1995) (student activities fund).

**7** There are actually two assumptions here: First, that the property has been dedicated to some objective use or purpose (i.e., a use or purpose independent of any speech restrictions); and second, that the objective use or purpose is somehow inconsistent with free and open speech.

\_\_\_, \_\_\_, 118 S. Ct. at 1641, 1643; <u>ISKCON v. Lee</u>, 505 U.S. at 681; <u>id.</u> at 699 (Kennedy, J., concurring in the judgments in <u>ISKCON v. Lee</u> and <u>Lee v. ISKCON</u>); <u>Kokinda</u>, 497 U.S. at 728-29, 733 (plurality opinion) (designation as nonpublic forum depends, in part, on purpose of property; solicitation disrupts purpose); <u>Cornelius</u>, 473 U.S. at 800; <u>United States Postal Service v. Council of Greenburgh Civic Ass'ns</u>, 453 U.S. 114, 130 n.6 (1981); <u>Greer v. Spock</u>, 424 U.S. at 838; <u>Adderley v. Florida</u>, 385 U.S. at 47-48. The Supreme Court has addressed this characteristic in evaluating the types of speech restrictions that are permissible in nonpublic fora. Restrictions on speech in nonpublic fora must be viewpoint neutral and reasonable "in light of the purpose of the forum and all the surrounding circumstances". <u>Cornelius</u>, 473 at 809. Therefore, restrictions on speech in public fora are justified to the extent that the speech at issue would interfere with the objective purposes and use of the forum. <u>See</u> , <u>e.g.</u>, <u>ISKCON v. Lee</u>, 505 U.S. at 688, 692 (O'Connor, J., concurring in <u>ISKCON v. Lee</u> and concurring in the judgment in <u>Lee v. ISKCON</u>) (quoting <u>Perry</u>, 460 U.S. at 50-51, itself quoting <u>U.S.P.S. v. Greenburgh</u>, 453 U.S. at 129-130) (reasonableness justified by "lawfully dedicated" intended use of the property). <u>See also Multimedia Pub. Co. v. Greenville-Spartanburg Airport District</u>, 991 F.2d 154, 159 (4th Cir. 1993) ("the overall assessment [as to reasonableness] must be undertaken with an eye to the `intended purposes,' of [the property] and of the ways in which the regulated conduct ... might actually interfere with the carrying out of those purposes.").

The final category is actually a hybrid of the other two. So-called "designated public fora" (often called "limited public fora") are those properties which the government has opened for expressive activity to the public, or some segment of the public. <u>Ark. Educ.</u>, 523 U.S. at \_\_\_. A designated public forum can be opened only to a limited class of speakers or for limited topics. <u>Perry</u>, 460 U.S. at 46 n.7. Merely allowing some speech on property that is not a traditional public forum does not automatically create a designated public forum. The Supreme Court recently clarified the distinction. The government creates a designated public forum when it purposefully makes property "generally available" to a class of speakers. <u>See Ark. Educ.</u>, 523 U.S. at \_\_\_, 118 S. Ct. at 1642 (quoting <u>Widmar v. Vincent</u>, 454 U.S. 263, 264 (1981)). By contrast, the government may retain nonpublic forum status by allowing selective, permission-only access to the

9

forum. See id. The granting of such permission must be contingent upon non-ministerial judgments. See id.; Cornelius, 473 U.S. at 804.

Two levels of First Amendment analysis are applicable to limited public fora. First, is the "internal standard" -- "[i]f the government excludes a speaker who falls within the class to which a designated [limited] public forum is made generally available, its action is subject to strict scrutiny." Ark. Educ., 523 U.S. at ___, 118 S. Ct. at 1641. That is, as regards the class for which the forum has been designated, a limited public forum is treated as a traditional public forum. So, for instance, a University may not exclude certain student speakers from meeting space or university funding otherwise available on a generalized basis to students and student groups. See Widmar, 454 U.S. 263. Cf. Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819 (1995) (exclusion was viewpoint-based).

The second standard, the "external standard", places restrictions on the government's ability to designate the class for whose especial benefit the forum has been opened. The Supreme Court has not yet clearly stated what these external limitations are, except to say that once a limited forum has been created, entities of a"similar character" to those allowed access may not be excluded. Perry, 460 U.S. at 48. Cf. also id. at 55 ("the state may draw distinctions which relate to the special purpose for which the property is used"); Ark. Educ., 523 U.S. at ___, 118 S. Ct. at 1647 (Stevens, J., dissenting) ("the First Amendment will not tolerate arbitrary definitions of the scope of the forum."); Cornelius, 473 U.S. at 825-27 (Blackmun, J., dissenting) (discussing limits, if any, placed on government's ability to define the scope of a limited public forum). Initially, since designated public fora, in the absence of an affirmative governmental designation, would be treated as nonpublic fora, it would seem logical that the selection of the class would be subject only to the standards applicable to restrictions on speakers in a nonpublic forum. That is, the selection of a class by the government must only be viewpoint neutral and reasonable in light of the objective purposes served by the forum.**8** See ante at 7.

_____

**8** As Justice Blackmun has pointed out, see Cornelius, 473 U.S. at 825-27, this in effect makes the limited public forum analytically indistinct from a nonpublic forum. If it is reasonable (or unreasonable) to exclude a speaker from a nonpublic forum, then it must also be reasonable (or unreasonable) to exclude the speaker from the class of speakers to which the forum has been opened on a limited basis.

10

III.

A.

The Center Island mall is a traditional public forum. The Center Island mall has the physical characteristics of a public thoroughfare like a park or a mall; it has the objective use and purposes of open public access and its use is eminently compatible with expressive activity; and it is part of a class of property which by history and tradition has been open and used for expressive activity.

The Center Island mall has the physical characteristics of a public thoroughfare like a park or a mall. The district court and the majority disagree. They describe the Center Island mall as merely a landscaped "median dividing a u-shaped driveway" and they argue that landscaped medians are not traditional public fora. Both contentions are wrong.

The Center Island mall is not merely a landscaped median strip. We have not been given the exact dimensions of the Center Island mall, but the aerial photos indicate that it is at least 30 yards wide and approximately two hundred yards long (i.e., it has more square footage than a football field), divided into three sections of roughly equal size by street intersections. Sidewalks circumnavigate the mall and traverse a center landscaped area, inviting pedestrians to stroll along the mall and explore the landscaping further. The section of the mall closest to the Government Center features a circular landscaped area with additional walkways. A "mall" is defined as "a usu[ally] public area (typically a lane or similar strip) often set with trees or bushes or flowers and designed as a promenade for leisurely strolling or as a pedestrian walk." Webster's Third New International Dictionary 1367 (unabr. 1993). A park is "a tract of land maintained by a city or town as a place of beauty or of public recreation." Id. at 1642. The Center Island mall fits neatly into these definitions.

The majority tries to avoid these common sense designations of the Center Island mall by focusing on the fact that the Center Island mall is surrounded by a "driveway". The fact that the Center Island mall is surrounded by streets or a "driveway" does not suggest that it is not a public forum. Municipal parks and malls are always surrounded by

11

streets. Because of limited space in municipalities, parks and malls must be squeezed between streets, serving both as destinations for park-type activities and as traffic control mechanisms. See, e.g., Flamer v. City of White Plains, New York, 841 F. Supp. 1365, 1368 (S.D.N.Y. 1993) (noting that municipal park was merely a median between two streets, only 15 feet wide at its narrowest end). Under the majority's approach, one could argue that the National Mall is merely a median dividing Independence Avenue from Constitution Avenue, or, more to scale, that the Mount Vernon park in Baltimore, housing the nation's first Washington monument, is merely a median dividing traffic on Charles Street.

In fact, that the Center Island mall is an open area surrounded by a "U-shaped driveway" lying directly in front of a seat of government provides support for the idea that the Center Island mall is a traditional public forum. The physical characteristics of the Center Island mall are strikingly similar to the government center grounds in Edwards v. South Carolina, 372 U.S. 229. There the Supreme Court described the grounds on and around which the protesters were marching as the "horseshoe," a fairly large open area, surrounded by sidewalks. Edwards, 372 U.S. at 230. The"horseshoe" received its name because it was defined by a U-shaped driveway. See id. at 230-32, 240 & n.3 (majority opinion and Clark, J., dissenting). The Supreme Court had no trouble treating the horseshoe-- an open area surrounded by a U-shaped driveway -- as a traditional public forum. See id. at 235-236. I would follow the Supreme Court's lead.

The Center Island mall has the objective use and purpose of open access to the general public, which is eminently compatible with the widest scope of expressive activity. The majority argues that areas like the Center Island mall do not have the objective purpose and use to promote expressive activity because they are"designed primarily for aesthetic purposes such as plantings". Ante, at 6. This is irrelevant, however; the fact that the Center Island mall may have been designed primarily for "aesthetic purposes, such as plantings" does not provide support for the majority's position. First, the primary purpose for which a particular piece of property was created is not dispositive. One cannot seriously argue with Justice Kennedy's observation that the traditional public fora of streets, sidewalks, and parks are not primarily designed for expressive purposes. See ISKCON v. Lee, 505

12

U.S. at 696-97 (Kennedy, J., concurring in the judgments in ISKCON v. Lee and Lee v. ISKCON). Sidewalks are designed for safer and more convenient walking; the Supreme Court has noted that "the primary purpose to which the streets are dedicated" is "the movement of people and property." Schneider v. State of New Jersey, 308 U.S. 147, 160 (1939). As the definitions quoted above indicate, and any stroll will confirm, parks and malls are often designed merely for aesthetic purposes, including plantings. The test is not whether the property was designed for expressive activity, but whether the objective uses and purposes of the property are compatible with the wide measure of expressive conduct characterizing public fora. See Grayned v. City of Rockford, 408 U.S. 104, 116 (1972) ("The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."). There is no doubt that the objective use and purpose of the Center Island mall is compatible with expressive activity. The Center Island is an outdoor, non-enclosed area, open to the public. The County has admitted that speech is compatible with the Center Island mall by "encouraging" qualified persons (who number close to one million people) to use it for all manner of expressive activity. The district court agreed with the County's assessment:

> Because it is close to the seat of government and yet far enough away that activity there would cause no disruption, it is a particularly apt location in which to engage in political or otherwise protected speech.

988 F. Supp. 957, 963. In fact, up until November 1996, access to the Center Island was apparently open to all speakers via a licensing procedure. Ms. Warren was actually allowed to mount a Christmas display on the grounds of the Government Center Complex in 1995.

Finally, the Center Island is part of a class of property which, by history and tradition, has been treated as a public forum. It is a part of the grounds of a seat of legislative and executive power. "In general, the grounds ... of state and federal capitol complexes ... have consistently been held to be public fora." ACT-UP v. Walp, 755 F. Supp. 1281, 1287 (M.D. Pa. 1991) (citing, inter alia, Grace, 461 U.S. 171). See also Edwards, 372 U.S. 229; Adderley v. Florida, 385 U.S. at 41 (distinguishing Edwards by stating,"[t]raditionally, state capitol

13

grounds are open to the public. Jails ... are not."); <u>Women Strike for Peace v. Morton</u>, 472 F.2d 1273, 1287 (D.C. Cir. 1972) (Wright, J., concurring) ("Parks are much more like state capitol grounds .... [they] have long been regarded as `a particular kind of community area that, under the Anglo-American tradition, are available, at least to some extent and on a reasonable basis, for groups of citizens concerned with the expression of ideas.'") (quoting <u>Women Strike for Peace v. Hickel</u>, 420 F.2d 597, 600 (1969)).

Thus, we are faced with a park or a mall, strikingly similar to property already determined by the Supreme Court to be a traditional public forum, which is open to the public, which is suitable and actually used for expressive activity, and which, lying directly in front of a seat of government power, is part of a class of property traditionally open to expressive activity. I cannot fathom how the majority maintains that the Center Island mall is not a public forum.

B.

Even if I was to agree with the majority that the Center Island mall is only a landscaped median strip, I would disagree with the majority's conclusion that median strips are not traditional public fora.[9] Neither the district court nor the majority cited to any authority supporting their novel attempt to carve out an exception from the public forum doctrine for property that, quite literally, lies at the heart of the Supreme Court's quintessential example of the traditional public forum. If streets, sidewalks and parks are traditional public fora, then a court bears a heavy burden in explaining why property which is merely a combination of all three from the standpoint of physical characteristics, objective uses and purposes, and traditional and historic treatment, is not. Median strips, like sidewalks, are integral parts of the public thoroughfares that constitute the traditional public fora.[10]

_____

[9] I note that I am not referring to median strips on interstates and similarly cordoned off expressways, which by their nature are not generally accessible to pedestrians. The Center Island mall is not such a median strip, as evidenced by the sidewalks around its circumference. For a discussion of the great variety of median strip shapes, sizes, and characteristics, see <u>ACORN v. City of New Orleans</u>, 606 F. Supp. 16, 19 n.6, and 22-24 (E.D. La. 1984).

[10] Many jurisdictions even include median strips and sidewalks in their definition of the term "street". <u>See</u>, <u>e.g.</u>, <u>Central American Refugee</u>

14

In many cases, median strips house sidewalks.**11** If a person who is rightfully on a street or sidewalk left open to the public "carries with him there as elsewhere the constitutional right to express his views in an orderly fashion," Jamison v. Texas, 318 U.S. 413, 416 (1943), I do not see how the person loses that right merely by stepping onto the median. Nor does the general public. Consistent with the median strip's function as part of the public thoroughfares traditionally open to the public for expressive activities, people have been engaging in such activity on median strips for as long as median strips have been in existence. Newspaper criers, local civic fundraisers, members of political campaigns, religious groups, and people with a message have often chosen median strips, with their ready access to the bustle of undifferentiated humanity, as their preferred launching point for expressive conduct.

In fact, given that streets and sidewalks are the prototypical examples of traditional public fora, I am perplexed at the majority's conclusory, one-sentence dismissal of the idea that medians are not part of these traditional public fora. Especially so, since every other court that has addressed the matter has treated medians for First Amendment purposes as part and parcel of the streets and sidewalks of which they form an integral part, including the Ninth Circuit, the Sixth Circuit, the Fifth Circuit, the Eighth Circuit, and a court in the Eleventh Circuit. See Sloman v. Tadlock, 21 F.3d 1462, 1465, 1469 (9th Cir. 1994); ACORN v. City of Phoenix, 798 F.2d 1260, 1267 (9th Cir. 1986); Ater v. Armstrong, 961 F.2d 1224, 1225, 1227 (6th Cir. 1992); Int'l Society for Krishna Consciousness of New Orleans, Inc. v. City of Baton Rouge, 876 F.2d 494, 497 (5th Cir. 1989); ACORN v. City of New Orleans, 606 F. Supp. 16, 19-20 (E.D. La. 1984); Ass'n of Community Organizations for Reform Now v. St. Louis County, 930

_____

Center-Carecen (N.Y.) v. City of Glen Cove, 753 F. Supp. 437, 443 (E.D.N.Y. 1990); ISKCON of New Orleans, Inc. v. City of Baton Rouge, 668 F. Supp. 527, 530 n.3 (M.D. La. 1987), aff'd  876 F.2d 494 (5th Cir. 1989).

**11** The majority's approach would force courts in the future to try and distinguish when a sidewalk is a public forum because it is a sidewalk and when a sidewalk is a nonpublic forum because it is actually a median strip.

15

F.2d 591, 593, 594 (8th Cir. 1991); News & Sentinel Co. v. Cox, 702 F. Supp. 891, 899 (S.D. Fla. 1988). The majority does not cite to even one of these cases. In each of these cases, restrictions that affected an individual's use of medians for expressive purposes were analyzed under the traditional public forum analysis.[12]

C.

Therefore, no matter whether the Center Island mall is a park or a mall or a landscaped median strip, it is still a traditional public forum. Content-neutral regulation of speech in the Center Island mall is thus limited to "reasonable restrictions on the time, place, or manner ... provided the restrictions ... `are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" Ward v. Rock Against Racism, 491 U.S. at 791 (quoting Clark v. Community for Creative Nonviolence, 468 U.S. at 293). The County cannot exclude a speaker from the Center Island unless "`the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest.'" Ark. Educ. , 523 U.S. at ___, 118 S. Ct. at 1641 (quoting Cornelius, 473 U.S. at 800). The County's exclusion of non-residents must fall before these tests.

The County's exclusion of non-residents is not a reasonable time, place, or manner restriction. Recognizing the important traffic and safety concerns at issue, several courts have upheld limits or even bans on certain speech in areas in close proximity to streets with moving traffic, including median strips, as reasonable time, place, or manner restrictions. See, e.g., ACORN v. City of Phoenix, 798 F.2d at 1267; ISKCON of New Orleans, Inc. v. City of Baton Rouge, 876 F.2d at 497. The County has not asserted any traffic or safety need to shut down the Center Island mall to expressive conduct by non-residents.

_____

[12] Several of these courts reserved the question of whether streets that have been opened to traffic still constitute traditional public fora. See, e.g., ACORN v. City of Phoenix, 798 F.2d at 1267; News & Sentinel Co. v. Cox, 702 F. Supp. at 899 n.21. Even if streets opened to traffic are not traditional public fora, this would not necessarily indicate that median strips, especially those housing sidewalks, also lose their traditional public fora status.

16

Nor could the County make such a claim -- its avowed goal is to encourage qualified persons to use the Center Island mall for expressive conduct. Therefore, the residency restriction is unreasonable as a time, place, and manner restriction.

Nor is the County's exclusion of non-resident speakers narrowly tailored to achieve compelling state interests. The County has asserted numerous interests served by its residents-only policy: (1) it reduces the County's maintenance, upkeep, and wear-and-tear costs, because, inter alia, it reduces the amount of resources the County must devote to ensure compliance with the other terms of the Memorandum; (2) it ensures the availability of the Center Island mall for use by residents; (3) it is an efficient way to allocate limited resources; (4) it reduces the clutter that might accrue on the Center Island mall by limiting the number of potential users who may set up a display; (5) it provides a benefit to County residents whose tax dollars built and maintain the Complex; and (6) it avoids the creation of an indiscriminately opened public forum. Assuming that at least some of these interests are compelling,[13] the residents-only policy must be struck down because it is not narrowly tailored to achieve any of these ends. While narrow tailoring under the time, place, and manner standard does not require use of the least-restrictive alternative, Ward, 491 U.S. at 797, the County may not burden substantially more speech than is necessary to further its interests, id. at 799. Here, the County's policy burdens substantially more speech than necessary to further any of its asserted interests. The County has closed this public forum to the entire world of speakers except the class of qualified persons. The same interests could be achieved with much less burden by the simple expedients of charging fees for upkeep and monitoring costs, or by creating a priority system favoring qualified persons.

Further, the record shows that, in fact, the County's policy is wholly unnecessary as concerns the Center Island mall. Since November 1996, only eight applications have been received for private displays in the Center Island mall; six of these have been from Ms. Warren or one of her supporters. The Center Island mall is large enough to accommodate numerous displays at the same time. Since

_____

[13] Undoubtedly, it cannot be a compelling state interest to treat a public forum as a nonpublic forum.

17

we are not using a rational basis analysis we need not credit theoretical arguments raised by the County. Certainly the demand for use of the Center Island mall has not necessitated the County's residents-only policy. I would therefore strike down the residents-only policy on First Amendment grounds as applied to the Center Island mall.

WILKINSON, Chief Judge, concurring:

Speech is presumptively a national commodity. The Supreme Court has said as much in applying the First Amendment to the states. Gitlow v. New York, 268 U.S. 652, 666 (1925).*

Plaintiff here seeks to put this proposition to the test. She asks nothing more than to spread and celebrate the message of her faith in a large, common, open-air public space. She was denied the right to speak solely because she was not a resident of Fairfax County, but rather of an independent city surrounded by the County. To limit a forum such as this one to those who live within the jurisdiction is to balkanize our civic dialogue. Were the Freedom Riders to be denied access to public fora in the South because they came from out of state? Is a Vermonter to be denied access to an Ohio public forum if he wishes to bring attention to the problem of acid rain? Is a pro-life Ohioan to be disallowed from protesting pro-choice developments in Virginia? And are Virginians, who are concerned about garbage trucked into their state from New York, to be prohibited from protesting such actions in a New York public forum?

Speech in America cannot be that parochial. The fact that this forum is near a government complex would seemingly present an even more urgent question. The Washington metropolitan area is an especially interconnected region, nowhere more so than where traffic tie-ups are concerned. Is a speaker from one jurisdiction to be denied the right to protest the position of a neighboring governing body on the widening of the Springfield Interchange or the replacement of the Woodrow Wilson Bridge?

_____

*My good colleague Judge Niemeyer appears to protest this view in his dissent (see section VI). But none of the examples he gives involve restrictions solely on non-residents in an open-air public space at the seat of government.

18

Surely a speaker is entitled to spread the faith or the political gospel beyond the community in which she lives. Even in the age of the Internet, there may be those who prefer to present their message face-to-face. None of this means that local governments are without recourse in dealing with open-air public fora speakers. Such fora remain subject to reasonable time, place, and manner restrictions. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984). Especially with respect to matters of security, but also in maintaining the beauty and ambience of the public setting, local governments deserve latitude. The answer, I think, lies in according municipalities time, place, and manner flexibility rather than permitting them to silence altogether those who serve to connect our national speech.

NIEMEYER, Circuit Judge, dissenting:

Rita Warren applied to Fairfax County, Virginia, for a permit to display a creche and other objects conveying her message of "love, hope, and peace" on a grassy median on the grounds of the Government Center Building. After the County denied the permit because the median was designated for displays only by county residents and employees and Warren was neither, she filed this action, contending that the County's restriction violated her First Amendment rights.

The district court dismissed Warren's action, holding that Fairfax County "made unmistakably clear its intention" to establish the median as a "limited public forum" for use by individuals and groups who have a specified relationship with Fairfax County and that the "use restriction [was] reasonable in light of the purposes served by the [median]." Warren v. Fairfax County, 988 F. Supp. 957, 964, 966 (E.D. Va. 1997). For the reasons that follow, I would affirm.

I.

Through regulation, Fairfax County has designated the common areas of three buildings and their grounds (including driveways, sidewalks, and parking areas) for use for displays, performances, fairs, and the like by residents and employees of Fairfax County. While all three buildings are located on Government Center Parkway -- the Government Center Building at 12000; the Pennino Building at

19

12011; and the Herrity Building at 12055 -- the regulation does not purport to extend beyond the grounds of these buildings to the Parkway itself or its sidewalks. This case involves the application of the regulation to deny Warren a permit to display a creche on the median area in front of the Government Center Building.

The Government Center Building appears to be located in an otherwise largely wooded area that is removed from residential, commercial, and office areas where people would be likely to gather. The building is accessed from Government Center Parkway by a horseshoe-shaped driveway that leads from the Parkway to the front door of the Building and back to the Parkway. Enclosed by the driveway is a median consisting of grass, trees, brick, and concrete. This median, often referred to as the Center Island, has a width, according to the majority, of 30 yards. It was primarily designed, as the district court observed, "for aesthetic purposes such as plantings," Warren, 988 F. Supp. at 962, and it is a part of the grounds around the Government Center Building that are subject to Fairfax County's "Procedural Memorandum No. 08-05," addressing "Regulations for Public Use of Facilities and Grounds at the Fairfax County Government Center Complex." That Memorandum defines the purpose of its regulations as follows:

> It is a policy of the Fairfax County Board of Supervisors to encourage use of the common areas [defined as buildings, grounds, and parking lots] of the Government Center Complex by Fairfax County nonprofit organizations and individual citizens of Fairfax County for civic, cultural, educational, religious, recreational, and similar activities of a nonprofit nature -- and for intergovernmental purposes -- so as not to interfere with County government functions or conflict with official activities of the Board of Supervisors, Board-appointed commissions, the Board of Zoning Appeals or County agencies.

Fairfax County allows the use of the grounds around the Government Center Building by eight classes of entities, including "[a]ny individual resident of Fairfax County . . . for nonprofit personal/private use" and "[a]ny employee of the Fairfax County government for personal/private use." The regulation allows "[a]ttended displays" on the

20

Center Island, but each display is limited to one week per year, must be attended by an adult at all times, and must clearly state that it is a private display. A person is required to obtain a permit before erecting an attended display.

Rita Warren, a resident of Fairfax City, which is a neighboring political subdivision distinct from Fairfax County, applied for a permit to erect a creche and a cross aimed at spreading her message of "love, hope, and peace." Because Warren was neither a resident nor an employee of Fairfax County, her application was denied. She filed this action against Fairfax County, claiming, among other things, that the denial of her permit application violated her First Amendment right to free speech as applied to the states through the Fourteenth Amendment.

II.

The question presented by this appeal is whether Fairfax County can limit to county residents and employees the use, for the purpose of placing displays, of a grassy median within the horseshoe-shaped driveway in front of its Government Center Building. In resolving this question, we assume that the placement of a creche and a cross on the median to spread the message of love, hope, and peace would be speech protected by the First Amendment.

Under established Supreme Court precedent, the extent to which government may limit access to a particular place for speech depends on the character of the property at issue -- whether the forum is a "traditional public forum," a "designated public forum," or a "nonpublic forum." See Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (1998); Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 802 (1985); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44-46 (1983). Because "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property," Cornelius, 473 U.S. at 799-800, an inquiry into the nature and function of the property is necessary to determine the kind of restriction that is permissible under the First Amendment.

21

A traditional public forum, where restrictions on speech receive the highest scrutiny, is a public place where, by long history, the public has gathered to speak, debate, and exchange ideas. See Perry, 460 U.S. at 45. Only those "`[p]ublic places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be `public forums.'" United States v. Grace, 461 U.S. 171, 177 (1983); see also Frisby v. Schultz, 487 U.S. 474, 480-81 (1988) (holding that residential streets are traditional public fora). Such places are considered traditional public fora because they "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Perry, 460 U.S. at 45 (quoting Hague v. CIO, 307 U.S. 496, 515 (1939)).

Until now, only streets, sidewalks, and parks have been identified as traditional public fora and then only when the street, sidewalk, or park has been dedicated to the "free exchange of ideas." Cornelius, 473 U.S. at 800. The characterization of a place as physically a street, sidewalk, or park, without more, is not adequate to define a traditional public forum. See United States v. Kokinda, 497 U.S. 720, 727 (1990) (plurality opinion) ("The mere physical characteristics of the property cannot dictate forum analysis"). Similarly, the mere fact that property is publicly owned or freely accessible to people to come and go at will does not make it a traditional public forum. See Grace, 461 U.S. at 177 ("Publicly owned or operated property does not become a `public forum' simply because members of the public are permitted to come and go at will"). Thus, while Main Street in a small town may be a traditional public forum, an interstate highway might not be one. Similarly, a sidewalk on a public thoroughfare generally will be a traditional public forum, see id. at 179-80, whereas a sidewalk dedicated to one public building or on the grounds of that public building is not, see Kokinda, 497 U.S. at 727 (plurality opinion) (concluding that a United States Post Office sidewalk leading from the parking area to the front door of the post office was not a traditional public forum); see also Greer v. Spock, 424 U.S. 828, 835-37 (1976) (holding that footpaths and portions of state and county streets that were within military jurisdiction were not public fora even though they were freely open to civilian pedestrian and automobile traffic); cf. Grattan v. Board of Sch. Comm'rs, 805 F.2d 1160, 1162-63 (4th Cir.

22

1986) (holding that public school parking lots are not public fora). Similarly, a public square or commons is surely a traditional public forum, whereas a zoological park, a public cemetery, or even a public university is not. See, e.g., 32 C.F.R. § 553.22(f), (g) (restricting picketing, orations, displaying of placards, distribution of handbills, solicitation, and other forms of speech in the Arlington National Cemetery out of respect for the "honored dead"); Widmar v. Vincent, 454 U.S. 263, 267-68 n.5 (1981). Thus, a traditional public forum is a narrower category than the aggregate of its physical properties might suggest; it must be a public property with general accessibility that has as "a principal purpose . . . the free exchange of ideas." Cornelius, 473 U.S. at 800.

We thus may conclude that the Supreme Court cases have limited the traditional public forum to streets, sidewalks, and parks,**1** and then only to streets, sidewalks, and parks that have provided a place for expression as a principal purpose. We have found no case extending the traditional public forum beyond these bounds. Indeed, the Supreme Court "has rejected the view that traditional public forum status extends beyond its historic confines." Forbes, 523 U.S. at 678 (citation omitted).

In traditional public fora, in order for government to enforce a content-based restriction, "it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Perry, 460 U.S. at 45. The government may, however, impose a content neutral regulation on the time, place, or manner of expression as long as the regulation is"narrowly tailored to serve a significant government interest" and"leave[s] open ample alternative channels of communication." Id . (citations omitted).

The second type of forum relevant to our analysis is the designated

_____

**1** The majority cites Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546 (1975), for the proposition that a theater can be a traditional public forum. To the contrary, the Supreme Court said there that the auditorium at issue in that case was a "public forum[ ] designed for and dedicated to expressive activities." Id. at 555 (emphasis added). It is thus clear that the Court found the auditorium to be a designated public forum rather than a traditional public forum.

public forum. A designated public forum is created by the purposeful designation by government of a place for expressive activity. See Forbes, 523 U.S. at 677; Cornelius, 473 U.S. at 802. This designation can limit forum access to a class of people or for certain topics, see Perry, 460 U.S. at 46 n.7, thereby creating a"limited public forum," which allows the government to "legally preserve the property under its control for the use to which it is dedicated." Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 390 (1993); see also Rosenberger v. Rector & Visitors of the Univ. of Virginia, 515 U.S. 819, 829-30 (1995). Where a designated public forum is thus limited to a certain class of persons, restrictions on the speech of members of that class are subject to the same scrutiny as in the traditional public forum, but restrictions on the speech of persons outside that class are permissible so long as they are reasonable and not based on viewpoint. See Rosenberger, 515 U.S. at 829-30; Perry, 460 U.S. at 46.

Government properties that are neither traditional public fora nor designated public fora "are either nonpublic fora or not fora at all." Forbes, 523 U.S. at 677 (citing International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678-79 (1992)). "The government can restrict access to a nonpublic forum `as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" Id. at 677-78 (quoting Cornelius, 473 U.S. at 800 (alteration in original)). This is the same standard as that used to judge restrictions in limited public fora on persons who are outside the class of persons for whom a given forum was designated.

With these general principles in hand, I now turn to consider Fairfax County's restrictions on the median (Center Island) located on the grounds of its Government Center Building.

III.

We have found no case that has concluded that a median, a traffic island, or a similar plot separating public roadways or even dedicated roadways on public grounds is a traditional public forum.[2] Surely,

_____

[2] None of the cases cited by the majority hold otherwise. In International Soc'y for Krishna Consciousness of New Orleans, Inc. v.

24

such a median is not a place dedicated to bringing citizens together to exchange ideas. See Forbes, 523 U.S. at 677; Cornelius, 473 U.S.

_____

City of Baton Rouge, 876 F.2d 494 (5th Cir. 1989), the court merely assumed without deciding that streets and roadways were public fora and upheld an ordinance prohibiting the solicitation of drivers in their automobiles. See id. at 497-99. The court in ACORN v. City of Phoenix, 798 F.2d 1260 (9th Cir. 1986), upheld a similar ordinance, stating that "we need not decide whether public streets are perpetual public fora." Id. at 1267 (emphasis added). There is no holding that medians are traditional public fora. In ACORN v. St. Louis County, 930 F.2d 592 (8th Cir. 1991), the court upheld another ban on roadway solicitations. The court suggested that "the streets" constituted "a public forum," id. at 594, but did not hold that medians are traditional public fora. In Ater v. Armstrong, 961 F.2d 1224 (6th Cir. 1992), the court upheld yet another regulation on expressive activity on or by the street as applied to a Ku Klux Klansman distributing literature to motorists from the median. The court did hold "that the streets of Jefferson County, Kentucky are traditional public fora." Id. at 1227. But it said no such thing about medians standing alone. The word "median" does not appear anywhere in the majority opinion after the court's rendition of facts. See id. at 1226-30.

The issue in all four of these cases was essentially the same, and it had little to do with the case before us. The Eighth Circuit summed up the problem that the various solicitation restrictions were targeting when it observed that "solicitors [were] walking across lanes of traffic while cars were moving, detaining cars after the light turned green, and crossing between the front of one car and the rear of another. The solicitors regularly returned to the median only after the light turned green." St. Louis County, 930 F.2d at 596. The regulations were (permissibly) targeting dangerous activity occurring on the streets-- solicitation of drivers in their cars, not of persons on the medians. The courts were not faced with whether the medians themselves were traditional public fora.

In Sloman v. Tadlock, 21 F.3d 1462 (9th Cir. 1994), the final circuit court case cited by the majority, the court found viewpoint discrimination, see id. at 1468-69. This case has nothing to do with the traditional public forum doctrine, and the court did not even use the term "traditional public forum." Indeed, the court did not use the word "forum" at all.

The two district court cases that the majority cites, News & Sun-Sentinel Co. v. Cox, 702 F. Supp. 891 (S.D. Fla. 1988), and ACORN v. City of New Orleans, 606 F. Supp. 16 (E.D. La. 1984), also say nothing about whether medians are traditional public fora.

at 800. The majority's reliance on the dictionary definition of "park" does not advance the discussion because the Supreme Court has repeatedly noted that the mere characterization of a particular place as a park, street, or sidewalk is not determinative of whether that place is a traditional public forum. See Kokinda , 497 U.S. at 727 (plurality opinion); Greer, 424 U.S. at 838. Indeed, we have once before fallen into this same analytical error, see United States v. Kokinda, 866 F.2d 699, 702-03 (4th Cir. 1989) (holding that because sidewalks are generally traditional public fora, the sidewalk before the court must be a traditional public forum), only to be reversed by the Supreme Court, see United States v. Kokinda, 497 U.S. 720 (1990). Rather than rely solely on the physical characteristics of a park or sidewalk, we are instructed to focus on whether the property has been "devoted to assembly and debate," Perry , 460 U.S. at 45, or whether it has as a principal purpose "the free exchange of ideas," Cornelius, 473 U.S. at 800. See also Forbes, 523 U.S. at 677.

Leaving the majority's flawed analysis in this regard and applying the Supreme Court's criteria, it is apparent that not even every park is a traditional public forum because not every park is "devoted to assembly and debate" or "the free exchange of ideas." The Everglades or Yellowstone National Park are public parks open to the public. Yet, those parks are not dedicated to assembly and debate, and, indeed, in many portions of these parks, physical access is denied altogether to preserve the natural environment. Similarly, Arlington National Cemetery is a public park with physical features -- driveways, trees, and grass -- common to parks in general. Yet, because it is a place of burial, honor, and remembrance, to preserve decorum consistent with the park's function, the government has prohibited all picketing, demonstrating, displaying of placards, and distribution of handbills, pamphlets and leaflets at the cemetery. See 32 C.F.R. § 553.22(f), (g). Indeed, it even prohibits the public from engaging in "partisan activities" there. 32 C.F.R. § 553.22(i). Other national parks and monuments have similar restrictions. See, e.g., 36 C.F.R. § 7.96(g)(3)(ii)(A) (prohibiting demonstrations or special events in the vicinity of the Washington Monument on the National Mall in Washington, D.C.); 36 C.F.R. § 7.96(g)(3)(ii)(D) (prohibiting demonstrations or special events in the vicinity of the Vietnam Veterans

26

Memorial on the National Mall, an area stretching from Constitution Avenue to the sidewalk by the reflecting pool). **3**

We have also found no case that has concluded that even a street, sidewalk, or park forming part of the grounds of a governmental building that is dedicated to a particular governmental function is a traditional public forum. To the contrary, such adjunct spaces are associated with the building and are thought to be dedicated to the limited use for which the building is dedicated. Thus, they are designated public fora, limited public fora, or nonpublic fora, but not traditional public fora. See, e.g., Kokinda, 497 U.S. at 727-29 (plurality opinion) (parking lot and sidewalk on U.S. Post Office grounds); Grace, 461 U.S. at 178-80 (lawn, plaza, and steps on Supreme Court grounds); Greer, 424 U.S. at 837-39 (publicly accessible footpaths and streets in military reservation); Adderly v. Florida, 385 U.S. 39, 41, 47 (1966) (grounds outside jailhouse); Grattan, 805 F.2d at 1162-63 (parking lot on public school grounds). A fortiori, if streets, sidewalks, and parks forming a part of the grounds of a public building dedicated to a particular governmental function are not traditional public fora, neither are medians located on such grounds.

The scope of restrictions in this case, both in geography and in kind, are analogous to those considered in Grace . There, the Supreme Court left standing a regulation for the Supreme Court grounds in Washington, D.C., that prohibits "processions or assemblages" or the "display [of] any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement." 40 U.S.C. § 13k. In ruling that this regulation, which applied to the Supreme Court grounds, as well as the perimeter sidewalks, could not apply to the perimeter sidewalks because those sidewalks were "indistinguishable from any other sidewalks in Washington, D.C.," Grace, 461 U.S. at 179, the Court explained:

> We do not denigrate the necessity to protect persons and property or to maintain proper order and decorum within the

---

**3** In Henderson v. Lujan, 964 F.2d 1179 (D.C. Cir. 1992), the D.C. Circuit struck down the restriction as applied to leafletting on the perimeter sidewalks that are between 100 and 260 feet from the memorial, but it left standing the remainder of the regulation.

27

> Supreme Court grounds, but we do question whether a total ban on carrying a flag, banner, or device on the public side-walks substantially serves these purposes.

Id. at 182 (emphasis added); see also Kokinda, 497 U.S. at 733-37 (plurality opinion) (upholding U.S. Postal Service regulations limiting speech on post office grounds); Greer, 424 U.S. at 839 (upholding governmental regulations limiting speech on public streets and foot-paths in military reservation); Adderly, 385 U.S. at 42-43 (upholding a trespass statute as applied to demonstrators on grounds outside a jailhouse); Grattan, 805 F.2d at 1163-64 (upholding use of a state statute to remove an individual distributing flyers in a school parking lot).

The Government Center Building in this case is located on public grounds, remote from other public areas, and contiguous to Govern-ment Center Parkway. While Government Center Parkway is a public thoroughfare providing access to the Government Center Building as well as other places, the driveway leading to the Government Center Building is located on the Building's grounds and is dedicated solely for access to that building for persons having business there. While the Parkway itself and the sidewalks of the Parkway may be tradi-tional public fora, as they exist for general use by the public, the lim-ited purpose driveway to the Government Center Building is more analogous to the access sidewalk located on the United States Post Office grounds in Kokinda, or the plaza, lawn, and steps around the Supreme Court in Grace, or the public pathways and streets in the military complex in Greer, or the jailhouse grounds in Adderly, or the school parking lot in Grattan. And as the horseshoe-shaped driveway to the Government Center Building in this case is dedicated to a lim-ited purpose, so too is the median dividing the sides of the driveway.

In short, the median dividing the driveway of the Government Cen-ter Building has not, by "long tradition," been "devoted to assembly and debate." Perry, 460 U.S. at 45. And it does not have as a "princi-pal purpose," the "free exchange of ideas" by the public generally. Cornelius, 473 U.S. at 800. Indeed, medians generally are not areas devoted to those purposes. They are for dividing traffic, usually for aesthetic and safety purposes. As importantly, the median in this case forms part of the grounds of the Government Center Building and is

28

dedicated for use in connection with that building. It is not the traditional public forum of which the Supreme Court has spoken where people are historically free and likely to gather to express ideas. In light of the Supreme Court's admonition that courts should not extend traditional public forum status "beyond its historic confines," Forbes, 523 U.S. at 678 (citing Lee, 505 U.S. at 680-81), I conclude that the median at the Government Center Building is not a traditional public forum for First Amendment purposes.

IV.

Even though medians in general, and this median in particular, are not traditional public fora, a median may nevertheless be designated as a public forum or a limited public forum by a deliberate act of government. That designation cannot occur "by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802 (emphasis added) (citing Perry, 460 U.S. at 46). To be sure, courts "will not find that a public forum has been created in the face of clear evidence of a contrary intent." Id. at 803 (citation omitted). Accordingly, we must look to the Fairfax County regulation governing the use of the Government Center Building and its grounds to discover the County's intent as to the use of the median within these grounds.

In Procedural Memorandum No. 08-05, Fairfax County unambiguously designates the Government Center Building and its grounds, including its parking lot, as a "`limited' public forum." Perry, 460 U.S. at 48. Its intent is clearly stated -- to provide access to these areas for the civic, cultural, religious, recreational, and similar activities of its citizens and employees. Proc. Memo. No. 08-05, I.A. The Memorandum also imposes a number of other restrictions. Any use, for example, must be "nonprofit [and] personal/private." In addition, time limits are set for uses of the grounds; there are prohibitions against disruptive noise levels; displays are physically limited, and some must be attended; uses of bulletin boards have additional restrictions. There are special time, place, and manner rules for banners, temporary signs, artwork, performances, bake sales, fairs, picketing, demonstrations, receptions, and the like. But there is no effort to impose any of these limitations beyond the grounds of the Government Center Building (or beyond the grounds of the other two build-

29

ings covered by the policy). Specifically, there is no limitation imposed on the public's use of the public thoroughfare in front of the Government Center Building (Government Center Parkway) or the adjacent sidewalk, both of which may be traditional public fora.

Thus, through deliberate governmental action, Fairfax County has designated a public forum for limited use by a specified group of people, and there can be no mistake about the County's intent. Accordingly, under clear Supreme Court instruction, we must not find that "a public forum has been created in the face of clear evidence of a contrary intent" -- a mandate conveniently overlooked by the majority. Cornelius, 473 U.S. at 803.

Accordingly, in the face of Fairfax County's clear intent, I would conclude that Fairfax County has designated a limited public forum at its Government Center Building and on the grounds of that building.

V.

When government designates a limited public forum, restricted for use, for example, to a class of persons, such restriction is valid so long as it is reasonable and viewpoint neutral. See Perry, 460 U.S. at 49, 54. Such a policy need only "rationally further a legitimate state purpose." Id. at 54; see also the majority opinion (adopting Warren v. Fairfax County, 169 F.3d 190, 201 (4th Cir. 1999) (Murnaghan, J., dissenting)).

No argument has been made that Fairfax County's limitations on access to its Government Center Building and grounds are viewpoint based. Indeed, the very same display that Warren wanted to erect could have been erected by a Fairfax County resident or employee. Likewise, a display with an opposing viewpoint (one promoting hate, despair, and violence) would be disallowed if sought by a nonresident or nonemployee, such as Warren, but would be allowed if sought by a county resident or employee. The operation of the policy is totally unrelated to viewpoint. Rather, it depends entirely on whether a person is a member of the specified class.

30

I readily conclude also that the policy rationally furthers legitimate county purposes. It is a legitimate purpose to further access of citizens and government employees to their own government, promoting accountability and community. And it is also legitimate to celebrate the art, ideas, and culture of the citizenry, providing them a location for display within the community. The policy is analogous to a bulletin board in the lobby of a city hall that is dedicated to showing art made by children in that city's public schools. The paintings of the local children may have no more objective artistic value than paintings made by children in the next town, but the city has a legitimate interest in displaying the work of its own children to foster a sense of community.

These policies accordingly enhance the Fairfax County community spirit and tend to promote pride in the County and its government. As well, they facilitate communication between citizens and their government. Thus, in restricting display permits at the Government Center Building and its grounds to county residents and employees, Fairfax County rationally advances its legitimate policy.

VI.

In his concurring opinion, Chief Judge Wilkinson apparently finds comfort for the majority position in his generalized observation that "[s]peech is presumptively a national commodity." What he fails to note is that not every place can be an appropriate or unrestricted market for that commodity. See Cornelius, 473 U.S. at 799-800 (explaining that "[n]othing in the Constitution requires Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property"). Free speech, open debate, and public discourse form the backbone of an open, democratic government, and no one of us desires in the least to undermine any defense necessary to protect that structure. But we all also recognize that, so long as the free exchange of ideas is protected, there is a concomitant need to restrict the time and place for exercising that fundamental right. These limitations to no degree threaten free speech, public debate, or the free exchange of ideas. On the contrary, they enhance it by providing order in the same way that travel restrictions, such as requirements that traffic move on the right side and stop at traffic lights, enhance rather than restrict free travel.

31

In recognition of this axiom, Congress found it appropriate, for example, to prohibit orations, picketing, displaying of placards, and distribution of handbills and leaflets at the Arlington National Cemetery where the honor of the dead deserves that public debate be conducted elsewhere. Likewise, the Supreme Court has recognized that significant limitations on speech and debate are appropriate in other public places, such as in public airport terminal buildings (<u>Lee</u>); on U.S. Post Office grounds, including post office sidewalks (<u>Kokinda</u>); on Supreme Court grounds, including the Court's plaza, lawn, and steps (<u>Grace</u>); on the grounds of state universities (<u>Widmar</u>); on public streets and footpaths within a military reservation (<u>Greer</u>); and on grounds outside jailhouses (<u>Adderly</u>).

Fairfax County has adopted reasonable restrictions applicable to its designated limited forum at its Government Center Building and grounds, and they are no more intrusive than other similar restrictions in analogous contexts. In failing to recognize the limited nature of the forum in this case and in blindly adhering to rigid categories defined not by the requirements of the First Amendment but by undiscerning dictionary definitions, the majority yields to a fear that could, at extremes, trample necessary, reasonable rules of order.

For these reasons, I respectfully dissent.

I am authorized to state that Judge Widener and Judge Williams join in this opinion.